Michael A. Sirignano
Barry I. Levy
Sean Gorton
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,

Docket No.:_______ (      )

Plaintiffs,

-against-

ADVANCED COMPREHENSIVE LABORATORY, LLC d/b/a TOPLAB, MARK GLADSTEIN, M.D., VICTORIA FRENKEL, and JOHN DOE DEFENDANTS "1"-"10"

Defendants.
----------------------------------------------------------------------X

**COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to terminate a massive, on-going fraudulent scheme perpetrated against GEICO by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $10 million in fraudulent laboratory toxicology billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, fraudulent claims

using the United States mail seeking payment for thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable urine drug screening tests (the "Fraudulent Services") purportedly provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies.

2. Defendants Mark Gladstein, M.D. ("Gladstein") and Victoria Frenkel ("Frenkel") are listed members of Defendant Advanced Comprehensive Laboratory, LLC d/b/a TopLab ("Advanced Labs"), which has billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.

3. Gladstein and Frenkel, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit Advanced Labs to access a steady stream of New York-based patients and/or patient names, in order to fraudulently bill GEICO and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4. This action seeks to recover more than $945,000.00 that the Defendants wrongfully obtained from GEICO, and further seeks a declaration that GEICO is not legally obligated to pay reimbursement of more than $8,800,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Advanced Labs because:

(i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii) the Fraudulent Services– to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds; and

(iii) the Fraudulent Services were provided – to the extent that they were provided at all – through the use of illegal kickback and referral arrangements in violation of material licensing laws and regulations;

5. The Defendants fall into the following categories:

(i) Defendant Advanced Comprehensive Laboratory LLC d/b/a TopLab ("Advanced Labs") is a New Jersey limited liability company – that is also registered to conduct business in New York – through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii) Defendants Mark Gladstein, M.D. ("Gladstein") and Victoria Frenkel ("Frenkel") are registered members of Advanced Labs.

(iii) John Doe Defendants "1"-"10" are unlicensed laypersons who "brokered" or "controlled" patients that were treated, or who purported to be treated, first at various medical clinics located throughout the New York metropolitan area and then at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices that treated New York-based patients and who furthered the fraudulent scheme by steering Insureds to Advanced Labs in exchange for kickbacks from Advanced Labs and its members.

6. As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Fraudulent Services– to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds; and (iii) the Fraudulent Services were provided – to the extent that they were provided at all – through the use of illegal kickback and referral arrangements and in violation of material licensing laws and regulations..

7. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through Advanced Labs to GEICO.

8. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

9. The Defendants' fraudulent scheme continues uninterrupted through the present day, as Advanced Labs continues to seek collection on pending charges for the Fraudulent Services.

10. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $945,000.00.

## THE PARTIES

### I. Plaintiffs

11. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II. Defendants

12. Defendant Advanced Labs is a New Jersey limited liability company with its principal place of business in New Jersey.

13. Advanced Labs was organized in New Jersey on or about May 12, 2017, is controlled by Gladstein and Frenkel, and has Gladstein, Frenkel, and Vadim Dolsky ("Dolsky") as its listed members.

14. Advanced Lab was used by the Defendants as a vehicle to submit fraudulent New York No-fault insurance billing to GEICO and other insurers in New York.

15. On or about April 30, 2019, Advanced Labs filed a Certificate of Alternate Name in New Jersey, indicating that it also does business under the name TopLab.

16. Advanced Labs registered as a foreign limited liability company in New York on or about January 10, 2020.

17. Pursuant to § 802 of New York State's Limited Liability Company Law, Advanced Labs' application for authority to operate as a foreign limited liability company in New York lists Kings County as the county in New York in which the office of the limited liability company is located.

18. Pursuant to § 802 of New York State's Limited Liability Company Law, Advanced Labs' application for authority to operate as a foreign limited liability company in New York lists an address in Kings County as the address for service of process.

19. Pursuant to §§ 574 and 575 of New York State's Public Health Law, Advanced Labs performed, or purported to perform, urine drug screens on specimens from individuals in New York pursuant to a permit from the New York State Department of Health.

20. Advanced Labs submitted over $10 million in fraudulent billing to GEICO relating to toxicology services purportedly provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under New York no-fault insurance policies issued by GEICO.

21. Defendant Gladstein resides in and is a citizen of New York. Gladstein owned, controlled, and was a member of Defendant Advanced Labs.

22. Defendant Frenkel resides in and is a citizen of New York. Frenkel owned, controlled, and was a member of Defendant Advanced Labs.

23. Though not named as a defendant herein, Vadim Dolsky resides in and is a citizen of Puerto Rico. Dolsky was a member of Defendant Advanced Labs.

24. Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York. John Doe Defendants "1"-"10" are unlicensed laypersons who "brokered" or "controlled" patients that were treated, or who purported to be treated, first at various medical clinics located throughout the New York metropolitan area and then at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices that treated New York-based patients, and who furthered the fraudulent scheme by steering Insureds to Advanced Labs in exchange for kickbacks from Advanced Labs and its members.

**JURISDICTION AND VENUE**

25. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

26. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

27. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

28. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1), as the Eastern District of New York is the District where one or more of the Defendants reside.

29. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

30. For example, Advanced Labs performed, or purported to perform, urine drug screens on specimens from individuals in the New York metropolitan area under a permit from the New York State Department of Health and submitted all of the fraudulent billing under New York automobile insurance policies issued to GEICO's New York-based Insureds, mailing much of the billing and associated documentation in Brooklyn, New York to GEICO.

31. Further, in reliance on the fraudulent claims of Advanced Labs – many of which were mailed in Brooklyn, New York to GEICO – personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

32. What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

33. Moreover, and as set forth herein, the Defendants not only regularly committed tortious acts in New York, but they also committed tortious acts in New Jersey that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

34. GEICO underwrites automobile insurance in New York.

## I. An Overview of the Pertinent Law Governing No-Fault Reimbursement

### A. Pertinent New York Law Governing No-Fault Insurance Reimbursement

35. New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated thereto (11 N.Y.C.R.R. §§ 65, et

seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits" or "No-Fault Benefits") to Insureds.

36. In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

37. In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

38. In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

39. In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

40. Pursuant to New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

41. For instance, the implementing regulations adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) stats, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

42. New York law prohibits clinical laboratories, such as Advanced Labs, from paying kickbacks in exchange for patient referrals or splitting fees with healthcare providers.

43. New York Public Health Law § 587 provides that "[n]o clinical laboratory or its agent, employee or other fiduciaries shall make, offer, give, or agree to make, offer, or give any payment or other consideration in any form to the extent such payment or other consideration is given for the referral of services or participate in the division, transference, assignment, rebate, splitting of fees, with any health services purveyor, or with another clinical laboratory." See also 10 N.Y.C.R.R. § 34-2.4.

44. Similarly, New Jersey law prohibits kickback and fee splitting arrangements between clinical laboratories and any other person in connection with the referral of specimens to a laboratory, pursuant to N.J.S.A. 45:9-42.42(d).

45. Under the New York no-fault insurance laws, a healthcare services provider, including a clinical laboratory, which pays unlawful kickbacks in exchange for patient referrals in violation of New York State licensing requirements or licensing requirements in the state in which the service is performed, is not eligible to receive PIP Benefits.

46. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

47. In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

48. When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonably and medically necessary; and (iii) the service and the attendant fee were not excessive.

49. Pursuant to New York Insurance Law § 403, the NF-3 forms submitted by healthcare providers to GEICO, and to all other automobile insurers, must be verified by a healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

50. Similarly, all HCFA-1500 (CMS-1500) Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II. The Defendants' Fraudulent Scheme

### A. Overview of the Scheme

51. Beginning in 2018, and continuing through the present day, Advanced Labs, Gladstein, Frenkel, and John Doe Defendants "1"-"10" (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which Advanced Labs was used to bill GEICO and other New York automobile insurers millions of dollars for medically

unnecessary, illusory, and otherwise unreimbursable services; specifically urine drug screens testing for an exorbitant amount of drugs that were performed for no reason other than to generate profits.

52. After Advanced Labs was organized, Gladstein and Frenkel sought to maximize the fraudulent billing they could submit or cause to be submitted to GEICO and other insurers, by using Advanced Labs as a vehicle to submit fraudulent billing for medically unnecessary urine drug screening to GEICO and other insurers.

53. Advanced Labs needed patient referrals, or at least patient names, of individuals allegedly involved in automobile accidents in New York or otherwise eligible for coverage under New York's No-Fault Law in order to bill for the Fraudulent Services.

54. In order to obtain as many patient referrals and names as possible, Advanced Labs, Gladstein, and Frenkel entered into illegal financial arrangements with unlicensed laypersons, including John Doe Defendants "1"-"10", who "brokered" or "controlled" New York-based patients that were treated, or who purported to be treated, first at various medical clinics located throughout the New York metropolitan area and then at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey.

55. The ambulatory surgery centers, anesthesia practices, and interventional pain management practices that treated, or purported to treat, large volumes of New York No-Fault patients constituted the overwhelming majority of Advanced Labs' referral sources.

56. These referral sources included Healthplus Surgery Center LLC ("Healthplus Surgery"), which was an ambulatory surgery center in New Jersey that changed its corporate name to Integrated Specialty ASC LLC in June 2019.

57. During the same time that Advanced Labs received patient referrals from Healthplus Surgery, the New Jersey Department of Health (the "NJDOH") closed Healthplus Surgery for several weeks after an investigation revealed egregious lapses in infection control that may have exposed a massive number of patients to hepatitis B, hepatitis C, and human immunodeficiency virus ("HIV").

58. The Fraudulent Services billed under the names of Advanced Labs were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

**B. The Defendants' Fraudulent Treatment and Billing Protocol**

59. In virtually all of the claims identified in Exhibit "1", the Defendants purported to bill for fraudulent and medically unnecessary urine drug screen tests, involving testing for an exorbitant amount of drugs in virtually every urine drug screen test provided, or purported to be provided, to GEICO Insureds.

60. The Defendants maintained an office for Advanced Labs in Brooklyn, New York and, upon information and belief, generated many of the bills for the fraudulent and medically unnecessary urine drug screen tests from that office.

61. The Defendants then mailed many of the bills for the fraudulent and medically unnecessary urine drug screen tests from Brooklyn, New York.

**1. Legitimate Use of Urine Drug Screen Tests**

62. In a legitimate clinical setting, urine drug screens are not medically warranted in advance of pain management procedures, routine surgery, or anesthesia services.

63. In a legitimate clinical setting, urine drug screens may be useful in highly select cases, involving more advanced anesthesia services involving a higher risk subset of pre-screened patients to determine whether the patient is taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia.

64. Similarly, in a legitimate clinical setting, urine drug screens may be useful in advance of prescribing a controlled substance where there are legitimate indications for chronic opioid treatment, legitimate indications that a patient is abusing drugs, or a legitimate question regarding certain medication that a patient is taking, in order to determine the whether a patient is taking any medications or using any illicit drugs that might: (i) make them an inappropriate candidate for chronic opioid treatment; or (ii) have a negative interaction with the prescribed medication.

65. In the very limited situations where a urine drug test is warranted, the standard of care for urine drug testing first involves the performance of an initial qualitative test -- also known as a "screen" -- which defines the result as "positive" or "negative", indicating the presence or absence of a drug or drug class above the detection threshold of the test.

66. A qualitative test, in other words, determines whether the drug is present in a test specimen, not how much of the drug is present.

67. The purpose of performing qualitative urine drug screens is to determine whether any one of several drugs and/or types of drugs is present in the specimen.

68. Qualitative urine drug screens are performed to separate unexpected results, which may require additional confirmation or quantitative testing, from expected results, which generally do not require any further testing.

69. In other words, a qualitative test indicating the presence of a drug that is contained in a medication prescribed to the patient is an expected result, which generally would not require further testing. Similarly, a qualitative test indicating the absence of illicit drugs or drugs not contained in medication prescribed to the patient is also an expected result, which generally would not require further testing.

70. If a qualitative test indicates the presence of an unexpected drug, a confirmation test – which is also known as a quantitative test – may be used to then determine the amount of the drug in the specimen.

71. A quantitative test may also be used to detect a certain subset of drugs that cannot be detected by an initial qualitative test.

72. In contrast to qualitative drug testing results – which produces a value of "positive or negative" with respect to a specific drug – quantitative drug testing is a more complex and costly testing process that produces a precise numeric value representing the amount of a specific drug in the specimen.

73. In a legitimate clinical setting and in the absence of suspected drug use or illicit drug use, quantitative testing of illicit drugs or prescription medication is ordered markedly less frequently and is not medically necessary in the first instance.

74. For example, absent the finding of a non-prescribed or illicit substance detected during an initial legitimate qualitative urine drug test (i.e. a "positive" result for an unexpected substance), quantitative testing for multiple drugs is not medically necessary unless a practitioner is legitimately testing for specific drugs that cannot be detected in an initial qualitative test.

75. Accordingly, the routine performance of complex quantitative drug testing for a pre-determined list of drugs is inconsistent with the standard of care and is not medically necessary.

**2. The Fraudulent and Medically Unnecessary Urine Drug Tests Performed by Advanced Labs**

76. In many of the claims identified in Exhibit "1", there was no indication that the Insureds were demographically or medically high risk, consuming a significant amount of opioids, benzodiazepines, or other controlled substances, or abusing drugs.

77. Therefore, in many of the claims identified in Exhibit "1", there was no legitimate question regarding the medications that the Insureds were taking, and there were no legitimate concerns regarding the performance of the routine surgeries that warranted urine drug screens.

78. Even so, in the claims identified in Exhibit "1", the practitioners associated with Advanced Labs' referral sources routinely ordered medically unnecessary urine drug screens in connection with anesthesia services for routine surgeries and/or interventional pain management treatment and procedures they purportedly provided.

79. The Defendants then submitted, or caused to be submitted, thousands of urine drug screen charges, billing millions of dollars, for medically unnecessary tests regularly performed without any indication that the Insureds were taking any unreported medications, using any illicit drugs, or had risk factors warranting such urine drug screens.

80. Not only were the urine drug screens medically unnecessary based on the risk profiles of the Insureds and the procedures they were undergoing, but the urine drug screens were also medically unnecessary because – by the time the results of the urine drug screens were obtained – either: (i) the interventional pain management and anesthesia services had already

been performed; or (ii) the referring physician had already issued a prescription for pain management medication.

81. For example:

(i) On July 20, 2018, an Insured named DC was referred by Mark Schoenfield, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to DC on July 20, 2018. However, the results of the urine drug screen did not arrive until July 30, 2018 – ten days after DC received the anesthesia services.

(ii) On October 5, 2019, an Insured named KR was referred by Ani Kalfayan, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to KR on October 5, 2019. However, the results of the urine drug screen did not arrive until October 9, 2019 – four days after KR received the anesthesia services.

(iii) On September 27, 2019, an Insured named MA was referred by Alexander Baldonado, M.D. to Advanced Labs for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to MA on September 27, 2019. However, the results of the urine drug screen did not arrive until October 23, 2019 – nearly one month after MA received the prescription for pain management medication.

(iv) On September 27, 2019, an Insured named MD was referred by Alexander Baldonado, M.D. to Advanced Labs for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to MD on September 27, 2019. However, the results of the urine drug screen did not arrive until October 23, 2019 – nearly one month after MD received the prescription for pain management medication.

(v) On August 13, 2019, an Insured named MR was referred by Yasmeen Khan, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to MR on August 13, 2019. However, the results of the urine drug screen did not arrive until August 16, 2019 – three days after MR received the anesthesia services.

(vi) On September 27, 2019, an Insured named NB was referred by Duoping Wu, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to NB on September 27, 2019. However, the results of the urine drug screen did not arrive until October 2, 2019 – five days after NB received the anesthesia services.

(vii) On September 20, 2019, an Insured named OS was referred by Yasmeen Khan, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly

in connection with anesthesia services that were to be provided to OS on September 20, 2019. However, the results of the urine drug screen did not arrive until September 27, 2019 – seven days after OS received the anesthesia services.

(viii) On October 15, 2019, an Insured named SU was referred by Akhtar Ali, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to SU on October 15, 2019. However, the results of the urine drug screen did not arrive until October 18, 2019 – three days after SU received the anesthesia services.

(ix) On September 28, 2019, an Insured named RG was referred by Paul Dierlam, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to RG on September 28, 2019. However, the results of the urine drug screen did not arrive until October 2, 2019 – four days after RG received the anesthesia services.

(x) On December 2, 2019, an Insured named HT was referred by Margarita Kaganovskaya, M.D. – an anesthesiologist – to Advanced Labs for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to HT on December 2, 2019. However, the results of the urine drug screen did not arrive until December 4, 2019 – two days after HT received the anesthesia services.

82. These are only representative examples. In the claims identified in Exhibit "1", the practitioners associated with Advanced Labs' referral sources routinely ordered medically unnecessary urine drug screens that were provided and billed through Advanced Labs, and the results of the urine drug screens were not provided until after the insured received the pertinent anesthesia services or prescription for pain management medication.

83. In keeping with the fact that the urine drug screens were medically unnecessary, in virtually all of the claims identified in Exhibit "1", the putative "results" of the Defendants' urine drug screens were not incorporated into the Insureds' treatment plan, played no genuine role in the treatment or care of the Insureds, and no one responded to the irregularities on the urine drug tests even when illicit drugs were reported.

84. Under the circumstances employed by the Defendants, the urine drug screens amounted to the purposeful performance of useless, illusory and unnecessary urine drug screens solely to generate profits without regard to any patient need.

85. Further, in order to maximize the profits from the fraudulent charges for the medically unnecessary urine drug screens, Advanced Labs purportedly received referrals requesting multiple urine drug screens for each individual insured, but the results of those drug screens, in each instance, were often generated after the insured received the pertinent anesthesia services.

86. For example:

(i) An Insured named JT was referred to Advanced Labs for urine drug screens on seven separate occasions, ostensibly in connection with anesthesia services that were to be provided to JT on June 23, 2019, July 18, 2019, August 1, 2019, August 11, 2019, September 28, 2019, October 12, 2019, and October 19, 2019. However, the results of each urine drug screen did not arrive until after JT received the anesthesia services. In total, Advanced Labs billed GEICO over $19,000.00 for the seven separate medically unnecessary urine drug screens.

(ii) An Insured named GM was referred to Advanced Labs for urine drug screens on four separate occasions, ostensibly in connection with anesthesia services that were to be provided to GM on June 25, 2019, September 17, 2019, October 22, 2019, and February 4, 2020. However, the results of each urine drug screen did not arrive until after GM received the anesthesia services. In total, Advanced Labs billed GEICO over $10,000.00 for the four separate medically unnecessary urine drug screens.

(iii) An Insured named LB was referred to Advanced Labs for urine drug screens on three separate occasions, ostensibly in connection with anesthesia services that were to be provided to LB on April 26, 2019, July 26, 2019, and November 7, 2019. However, the results of each urine drug screen did not arrive until after LB received the anesthesia services. In total, Advanced Labs billed GEICO over $8,000.00 for the three separate medically unnecessary urine drug screens.

(iv) An Insured named CD was referred to Advanced Labs for urine drug screens on five separate occasions, ostensibly in connection with anesthesia services that were to be provided to CD on July 28, 2019, August 11, 2019, September 8, 2019, October 20, 2019, and November 3, 2019. However, the results of each urine drug screen did not arrive until after CD received the anesthesia services. In

total, Advanced Labs billed GEICO over $13,000.00 for the five separate medically unnecessary urine drug screens.

(v) An Insured named RD was referred to Advanced Labs for urine drug screens on seven separate occasions, ostensibly in connection with anesthesia services that were to be provided to RD on June 27, 2019, July 26, 2019, September 6, 2019, September 20, 2019, October 4, 2019, October 18, 2019, and November 18, 2019. However, the results of each urine drug screen did not arrive until after RD received the anesthesia services. In total, Advanced Labs billed GEICO over $18,000.00 for the seven separate medically unnecessary urine drug screens.

(vi) An Insured named CV-N was referred to Advanced Labs for urine drug screens on five separate occasions, ostensibly in connection with anesthesia services that were to be provided to CV-N on April 19, 2019, June 8, 2019, July 19, 2019, August 3, 2019, and December 7, 2019. However, the results of each urine drug screen did not arrive until after CV-N received the anesthesia services. In total, Advanced Labs billed GEICO over $13,000.00 for the five separate medically unnecessary urine drug screens.

(vii) An Insured named AA-Y was referred to Advanced Labs for urine drug screens on six separate occasions, ostensibly in connection with anesthesia services that were to be provided to AA-Y on September 8, 2019, September 22, 2019, October 4, 2019, October 20, 2019, October 25, 2019, and December 1, 2019. However, the results of each urine drug screen did not arrive until after AA-Y received the anesthesia services. In total, Advanced Labs billed GEICO over $16,000.00 for the six separate medically unnecessary urine drug screens.

(viii) An Insured named CB was referred to Advanced Labs for urine drug screens on five separate occasions, ostensibly in connection with anesthesia services that were to be provided to CB on July 28, 2019, August 25, 2019, September 8, 2019, October 11, 2019, and December 1, 2019. However, the results of each urine drug screen did not arrive until after CB received the anesthesia services. In total, Advanced Labs billed GEICO over $13,000.00 for the five separate medically unnecessary urine drug screens.

(ix) An Insured named YA was referred to Advanced Labs for urine drug screens on three separate occasions, ostensibly in connection with anesthesia services that were to be provided to YA on October 5, 2019, October 19, 2019, and October 26, 2019. However, the results of each urine drug screen did not arrive until after YA received the anesthesia services. In total, Advanced Labs billed GEICO over $8,000.00 for the three separate medically unnecessary urine drug screens.

(x) An Insured named JS was referred to Advanced Labs for urine drug screens on six separate occasions, ostensibly in connection with anesthesia services that were to be provided to JS on June 14, 2019, June 29, 2019, August 30, 2019, September 20, 2019, October 4, 2019, and October 18, 2019. However, the

results of each urine drug screen did not arrive until after JS received the anesthesia services. In total, Advanced Labs billed GEICO over $16,000.00 for the six separate medically unnecessary urine drug screens.

87. These are only representative examples. In the claims identified in Exhibit "1", Advanced Labs routinely generated the results of urine drug screens after the insureds had already received the pertinent anesthesia services on multiple occasions per Insured.

88. Furthermore, in order to maximize their profits from the fraudulent charges for the medically unnecessary urine drug screens, Advanced Labs frequently billed for both medically unnecessary qualitative *and* quantitative urine drug screens, ostensibly to confirm the results of contemporaneous in-office qualitative drug screens with negative results that were performed by Advanced Labs' referral sources.

89. For example:

(i) On or about January 23, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named WM, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,800.00 for these medically unnecessary urine drug screens.

(ii) On or about September 11, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named CP, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(iii) On or about September 11, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named AV, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(iv) On or about August 14, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named DJ, despite the fact that the contemporaneous qualitative urine drug screen

previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(v) On or about August 2, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named ST, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(vi) On or about July 3, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named KC, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,800.00 for these medically unnecessary urine drug screens.

(vii) On or about August 6, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named JM, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(viii) On or about August 14, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named JC, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

(ix) On or about July 3, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named RD, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,800.00 for these medically unnecessary urine drug screens.

(x) On or about July 24, 2019, Advanced Labs purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named OS, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Labs' referral source produced negative results. Advanced Labs billed GEICO over $2,700.00 for these medically unnecessary urine drug screens.

90. These are only representative examples. In the claims identified in Exhibit "1", Advanced Labs routinely provided medically unnecessary qualitative and quantitative urine drug screens despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

91. Again, under the under the circumstances employed by the Defendants, the performance of qualitative urine drug screens and complex quantitative urine drug screens amounted to the purposeful performance of useless, illusory and unnecessary urine drug screens solely to generate profits without regard to any patient need.

92. In addition, upon information and belief, in order to maximize their fraudulent charges for the medically unnecessary urine drug screens, Advanced Labs, in coordination with John Doe Defendants "1"-"10", required their various referral sources to establish custom-profiles.

93. Upon information and belief, these custom-profiles served as standing orders for Advanced Labs to conduct the same set of urine drug screens on every single specimen sent to Advanced Labs, regardless of whether or not each particular urine drug screen was medically necessary.

94. A copy of a custom-profile form taken from Advanced Labs' website is annexed hereto as Exhibit "2".

95. Advanced Labs' billing submissions to GEICO virtually always included charges for sixty-eight (68) separate quantitative urine drug screens.

96. For example:

(i) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named DC on or about July 30, 2018. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(ii) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named KR on or about September 11, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(iii) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named MA on or about October 23, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(iv) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named JM on or about October 23, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(v) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named SL on or about November 12, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(vi) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named OS on or about September 27, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(vii) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named SU on or about September 25, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(viii) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named PJ on or about August 27, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(ix) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named KP on or about August 15, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

(x) Advanced Labs submitted a bill to GEICO for, among other things, 68 separate quantitative urine drug screens that were purportedly provided to an Insured named MR on or about September 5, 2019. Advanced Labs billed GEICO $2,492.88 for these 68 separate quantitative urine drug screens.

97. Upon information and belief, the charges for the sixty-eight (68) separate quantitative urine drug screens were based on the custom-profiles established by Advanced Labs' various referral sources.

98. Many of the drugs included in the charges for the sixty-eight (68) separate quantitative urine drug screens are not drugs of abuse, including acetaminophen, naltrexone, and naloxone.

99. Additionally, certain of the drugs included in the charges for the sixty-eight (68) separate quantitative urine drug screens are virtually never consumed by the general public.

100. Routinely ordering quantitative testing for (i) non-drugs of abuse and (ii) drugs that are virtually never consumed by the general public, is a deviation from the standard of care and is not medically necessary.

**C. The Illegal Kickback and Referral Relationship**

101. Advanced Labs needed a constant flow of patient referrals, or at least patient names, in order to bill for the Fraudulent Services.

102. In order to obtain as many patient referrals as possible, Advanced Labs, Gladstein, and Frenkel entered into illegal financial arrangements with unlicensed laypersons, including John Doe Defendants "1"-"10", who "brokered" or "controlled" New York-based patients that were treated, or who purported to be treated, at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey.

103. In coordination with John Doe Defendants "1"-"10", various anesthesiologists and pain management practitioners steered Insureds to Advanced Labs for medically unnecessary urine drug screens, ostensibly in connection with either: (i) anesthesia services that

would purportedly be provided to an Insured; or (ii) a prescription for pain management medication that would purportedly be provided to an Insured.

104. Advanced Labs, Gladstein, and Frenkel made the various kickback payments in exchange for having Insureds steered to Advanced Labs for the medically unnecessary Fraudulent Services, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

105. The amount of kickbacks paid by Advanced Labs, Gladstein, and Frenkel generally was based on the volume of Insureds that were steered to Advanced Labs for the purported Fraudulent Services.

106. Absent the payment of kickbacks, Advanced Labs' referrals sources would not refer patients to Advanced Labs for the medically unnecessary urine drug screens, as Advanced Labs virtually always generated the results of the urine drug screen after the pertinent Insured had either: (i) already received the pertinent anesthesia services; or (ii) already received the pertinent prescription for pain management medication.

107. The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme, including the particular amounts paid for the kickbacks.

108. Nevertheless, based on the circumstances surrounding the arrangements with the referral sources, Advanced Labs, Gladstein, and Frenkel paid a financial kickback for each of the particular referrals made for the Fraudulent Services. The payment of the kickbacks was made at or near the time the referrals were issued.

109. The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from

the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

### E. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

110. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and reports through Advanced Labs to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

111. The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

(ii) The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided for patient care. In fact, the Fraudulent Services were illusory as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds.

(iii) The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others.

## III. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

112. The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

113. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

114. Specifically, the Defendants knowingly misrepresented and concealed facts related to Advanced Labs in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

115. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

116. Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

117. What is more, the Defendants billed for many of the fraudulent services under an alternate name – TopLab – in order to conceal the amount of billing submitted to GEICO in connection with the Fraudulent Services and to prevent GEICO from identifying the pattern of fraudulent charges submitted through Advanced Labs.

118. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming

collection actions against GEICO and other insurers if the charges were not promptly paid in full. The collection actions that the Defendants have commenced to collect on their fraudulent claims were commenced in New York, seeking to collect No-Fault Benefits under GEICO's New York automobile insurance policies for Fraudulent Services that they purported to provide to GEICO's New York-based Insureds.

119. GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them.

120. As a result, GEICO has incurred damages of more than $945,000.00 based upon the fraudulent charges representing payments made by GEICO to Advanced Labs.

121. Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against Advanced Labs**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

122. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

123. There is an actual case and controversy between GEICO and Advanced Labs regarding more than $8,800,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through Advanced Labs.

124. Advanced Labs has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

125. Advanced Labs has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services– to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds.

126. Advanced Labs has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

127. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Advanced Labs has no right to receive payment for any pending bills submitted to GEICO under its name.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Gladstein and Frenkel**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

128. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

129. Advanced Labs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

130. Gladstein and Frenkel knowingly conducted and/or participated, directly or indirectly, in the conduct of Advanced Labs' affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately two years seeking payments that Advanced Labs was not entitled to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and; (iii) the billed-for-services were illusory and useless and played no genuine role in the treatment or care of the Insureds; and (iv) Advanced Labs obtained its patients through the Defendants' illegal kickback scheme. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

131. Advanced Labs' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gladstein and Frenkel operate Advanced Labs, insofar as Advanced Labs is not engaged in a legitimate clinical laboratory business, the services billed to GEICO were unnecessary and illusory, and the testing was performed for no reason other than to generate profits. Therefore, acts of mail fraud are essential in order for Advanced Labs to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants

continue to attempt collection on the fraudulent billing submitted by Advanced Labs to the present day.

132. Advanced Labs is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Advanced Labs in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

133. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $945,000.00 pursuant to the fraudulent bills submitted through Advanced Labs.

134. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Gladstein, Frenkel, and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

135. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

136. Advanced Labs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

137. Gladstein, Frenkel, and John Doe Defendants "1"-"10" are employed by or associated with the Advanced Labs enterprise.

138. Gladstein, Frenkel, and John Doe Defendants "1"-"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of

Advanced Labs' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately two years seeking payment that Advanced Labs was not eligible to receive under New York no-fault insurance law because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services were illusory and useless and played no genuine role in the treatment or care of the Insureds; and (iv) Advanced Labs obtained its patients through the Defendants' illegal kickback scheme. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

139. Gladstein, Frenkel, and John Doe Defendants "1"-"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

140. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $945,000.00 pursuant to the fraudulent bills submitted through Advanced Labs.

141. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>**
**Against Gladstein, Frenkel, and Advanced Labs**
**(Common Law Fraud)**

142. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

143. Gladstein, Frenkel, and Advanced Labs intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Advanced Labs seeking payment for the Fraudulent Services.

144. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Fraudulent Services were provided for patient care and eligible for PIP reimbursement, when in fact the billed-for-services played no genuine role in the treatment or care of the Insureds; and (iii) in every claim, the representation that Advanced Labs and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement, when in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

145. Gladstein, Frenkel, and Advanced Labs intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through Advanced Labs that were not compensable under the New York no-fault insurance laws.

146. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $945,000.00 pursuant to the fraudulent bills submitted by the Defendants through Advanced Labs.

147. Gladstein, Frenkel, and Advanced Labs' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

148. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against John Doe Defendants "1-10"**
**(Aiding and Abetting Fraud)**

149. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

150. John Doe Defendants "1"-"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Gladstein, Frenkel, and Advanced Labs.

151. The acts of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme included, among other things, knowingly steering Insureds to Advanced Labs in exchange for illegal kickbacks from Gladstein, Frenkel, and Advanced Labs and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol designed to maximize profits without regard to patient care.

152. The conduct of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1"-"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Gladstein, Frenkel, and Advanced Labs to obtain payment from GEICO and other insurers.

153. John Doe Defendants "1"-"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Advanced Labs for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

154. The conduct of John Doe Defendants "1"-"10" caused GEICO to pay more than $945,000.00 pursuant to the fraudulent bills submitted through Advanced Labs.

155. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

156. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against Gladstein, Frenkel, and Advanced Labs**
**(Unjust Enrichment)**

157. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

158. As set forth above, Gladstein, Frenkel, and Advanced Labs have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

159. When GEICO paid the bills and charges submitted by or on behalf of Advanced Labs for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Gladstein, Frenkel, and Advanced Labs' improper, unlawful, and/or unjust acts.

160. Gladstein, Frenkel, and Advanced Labs have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Gladstein, Frenkel, and Advanced Labs voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

161. Gladstein, Frenkel, and Advanced Labs' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

162. By reason of the above, Gladstein, Frenkel, and Advanced Labs have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $945,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A. On the First Cause of Action against Advanced Labs, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Advanced Labs has no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against Gladstein and Frenkel, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $945,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Gladstein, Frenkel, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $945,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Gladstein, Frenkel, and Advanced Labs, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $945,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $945,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

F. On the Sixth Cause of Action against Gladstein, Frenkel, and Advanced Labs more than $945,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper.

Dated: May 29, 2020
Uniondale, New York

RIVKIN RADLER LLP

By: /s/ *Michael A. Sirignano*
Barry I. Levy
Michael A. Sirignano
Sean Gorton
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000 RR File: 5100-3071
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*